## Case No. 14,251.
### TURNER v. AMERICAN BAPTIST MISSIONARY UNION.

[5 McLean, 344.] [1]

Circuit Court, D. Michigan. June Term, 1852.

PUBLIC LANDS—TREATIES WITH INDIANS—RESERVATION OF PUBLIC LANDS—PLEADING IN EQUITY—INJUNCTION TO STAY EJECTMENT SUIT.

1. A state has no power over the public lands within its limits.

2. When the state of Michigan was admitted into the Union, it assented to a compact, which inhibited the exercise of this power.

3. A treaty is the supreme law of the land, only when the treaty-making power can carry it into effect.

4. A treaty which stipulates for the payment of money, undertakes to do that which the treaty-

[1] [Reported by Hon. John McLean, Circuit Justice.]

making power cannot do, therefore the treaty is not the supreme law of the land.

5. To give it effect, the action of congress is necessary.

6. And in this action, the representatives and senators act on their own judgment and responsibility, and not on the judgment and responsibility of the treaty-making power.

7. A foreign power may be presumed to know the power of appropriating money belongs to congress.

8. No act of any part of the government can be held to be a law which has not all the sanctions to make it law.

9. A reservation of land for a specific purpose, withdraws it from general location, and from preemption rights.

[Cited in U. S. v. Garretson, 42 Fed. 25.]

[Cited in Hamilton v. Spokane & P. Ry. Co. (Idaho) 28 Pac. 411.]

10. Where, in a treaty, 160 acres of land was reserved to be sold, in order to pay over the proceeds of the sale to those entitled to them, is a withdrawal of the land from general appropriation.

11. A bill is not multifarious, where it does not unite titles which have no analogy to each other, whereby the defendant's litigation and costs are increased.

12. An injunction to stay an ejectment suit, until matters of equity can be examined, will not be allowed, unless judgment in the ejectment be entered.

[Cited in Heirs of Szymanski v. Zunts, 20 Fed. 363.]

Mr. Patterson, for plaintiff.
Frazer & Davidson, for defendants.

OPINION OF THE COURT. This is a case in chancery, which involves several important questions. The power of the general government over the public lands, treaty-making power with the Indians, the powers of a state, and the effect of certain reservations under the pre-emption law, &c. The complainant states that in July, 1836, he settled upon the land now claimed by him, and in the ensuing spring built a permanent residence, and has ever since continued to reside on the same. That the 7th of July, 1838, the land was proclaimed, by the president, for sale, to take place 15th of October, 1838. On 12th of October, 1838, he proved his pre-emption claim, and tendered $200 for the entire quarter section. The entire section 25 at the falls of Grand river, in the state of Michigan, had been selected by the state of Michigan. 21st June, 1838, lot No. 2 was confirmed to the state of Michigan. The 9th Feb., 1842, a law of Michigan was passed, allowing Sibley to purchase lot No. 2; that he obtained a certificate of purchase, and Sibley conveyed to complainant a part of lot No. 2, which was a part of the 160 acres mentioned in the treaty. This Indian treaty was held at Washington city, the 28th of March, 1836, in the 8th article of which it is declared, "The mission establishments upon the Grand river shall be appraised, and the value paid to the proper boards." This was amended by the senate to read as follows: "The net proceeds of the

sale of the one hundred and sixty acres of land, upon the Grand river, upon which the missionary society have erected their buildings, shall be paid to the said society, in lieu of the value of their improvements." It was proved that the defendants, as a missionary society, had occupied the 160 acres for many years, had built a church and mission-house, and had made other improvements on the tract. It was also proved that the Catholics had occupied the same tract, or a part of it, and had constructed a chapel and other improvements. On this same tract the complainant had settled, and made his improvements. The defendants having commenced an action of ejectment, to recover possession of the land claimed by them, the complainant prayed for an injunction against the further prosecution of that suit, and that the court would establish his title, &c.

On the part of complainant it was contended that on the establishment of the state government, Michigan, by virtue of her sovereignty, had a right to all the lands within her limits. This argument is not now advanced for the first time. Several years ago it was broached in the senate, and in some of the state legislatures, but it was received everywhere with less favor than its advocates anticipated. It proffered so rich a boon to the new states, it was expected that they would embrace it with enthusiasm, and hail its advocates as the distinguished friends of state rights. The argument grew less cogent by the lapse of time, as the public lands passed into the hands of individuals, by purchase. Had it not been for this, no one can say that the policy would not have enlisted a powerful, if not successful party, in our political progress. Looking at the matter as a question of law, we have no hesitancy in saying the argument is groundless. The state of Michigan can exercise no power whatever over the public lands within her limits. She is expressly prohibited from doing this by a compact agreed to in the admission of the state into the Union.

A treaty under the federal constitution is declared to be the supreme law of the land. This, unquestionably, applies to all treaties, where the treaty-making power, without the aid of congress, can carry it into effect. It is not, however, and cannot be the supreme law of the land, where the concurrence of congress is necessary to give it effect. Until this power is exercised, as where the appropriation of money is required, the treaty is not perfect. It is not operative, in the sense of the constitution, as money cannot be appropriated by the treaty-making power. This results from the limitations of our government. The action of no department of the government, can be regarded as a law, until it shall have all the sanctions required by the constitution to make it such. As well might it be contended, that an ordinary act of congress, without the signature of the

president, was a law, as that a treaty which engages to pay a sum of money, is in itself a law. And in such a case, the representatives of the people and the states, exercise their own judgments in granting or withholding the money. They act upon their own responsibility, and not upon the responsibility of the treaty-making power. It cannot bind or control the legislative action in this respect, and every foreign government may be presumed to know, that so far as the treaty stipulates to pay money, the legislative sanction is required. Without a law the president is not authorized to sell the public lands, so that this treaty, though so far as the Indians were concerned, was the supreme law of the land, yet, as regards the right to the proceeds of the above tract, an act of congress is required. The treaty, in fact, appropriated the above tract of 160 acres for a particular purpose, but, to effectuate that purpose, an act of congress was passed. Under the act of 23d June, 1836 [5 Stat. 59], five entire sections of land were authorized, to be selected and located under the direction of the legislature of Michigan, in legal divisions of not less than one quarter section, from any of the unappropriated lands belonging to the United States, within the state, were granted to the state for the purpose of completing the public buildings of the said state, &c.

By virtue of this law, under the direction of the legislature of the state, the tract of 160 acres in controversy was, in part, located. This location is objected to on two grounds. 1. The land located amounted to less than a quarter section, and the above act did not authorize the entry of less than a quarter. 2. That under the treaty the land had been previously appropriated. Both of these grounds are fatal to the right of the state. Under the law, the state was bound to conform to its provision, and a less quantity than 160 acres could not be located. The other ground is clear. The part of the land entered had been specially appropriated by the treaty. The land itself was not appropriated, but its proceeds. which necessarily require a sale of the land, in the usual mode of selling public lands, by the government, at public auction, in order that the proceeds of the sale might be paid over to the proper persons. It was not, therefore, open to location by the agent of the state. The words of the act, are sufficient to show this. "Any unappropriated land belonging to the United States, could be taken, to satisfy the donation to the state. But in so far as the location interfered with the mission land, it was specially appropriated to be sold that the proceeds might be paid to the persons entitled to them." The same objection applies to the pre-emption claimed by the act of 1838 [5 Stat. 251], which continues the act of 1830 [4 Stat. 420]. That act declares that its provisions should not apply to lands which had been reserved or otherwise appropriated. It is contended that a treaty with Indian tribes, has not the same dignity or effect, as a treaty with a foreign and independent nation. This distinction is not authorized by the constitution. Since the commencement of the government, treaties have been made with the Indians, and the treaty-making power has been exercised in making them They are treaties, within the meaning of the constitution, and, as such, are the supreme laws of the land.

The objection that the bill is multifarious, arises on the demurrer. But we think it is not sustainable. The decisions on this subject are contradictory and unsatisfactory. The common sense rule in such cases is, that an individual shall not be called to maintain his title, or shall not assert it, in connection with others. to which it has no analogy, and in the investigation of which, the costs and the complexity of the case will be increased.

It is a rule of this court, in practice, not to allow an injunction, to stay a proceeding at law, until the matter in equity shall be investigated. In such cases the court require a judgment to be entered in the ejectment, as a condition to the allowance of an injunction. If this be not done, though the decision in chancery be favorable to the legal right, to gain the possession of the premises, a prosecution of the action at law may be necessary. To avoid delay in this respect, the rule has been observed.

The court overrule the demurrer, and enter a rule for answer.

[See Case No. 968.]

TURNER (BAPTIST MISSIONARY UNION v.). See Case No. 968.